McKEAGUE, J., delivered the opinion of the court in which NORRIS, J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 632^43), delivered a separate opinion concurring in part and dissenting in part.
OPINION
McKEAGUE, Circuit Judge.
Plaintiffs-appellants Lowestco Ballard and Geneva France were framed during Operation Turnaround, a corrupt investigation into the Mansfield, Ohio drug trade by the United States Drug Enforcement Agency (DEA) and the Richland County Sheriffs Office (RCSO). The federal government prosecuted Ballard and France for allegedly selling drugs to law-enforcement officials and confidential informant Jerrell Bray. After Operation Turnaround ended, however, Bray admitted that he used his friends to act as “stand-ins” for the drug buys and intentionally misidentified them to frame Ballard and France. Ballard and France then sued Bray, DEA Special Agent Lee Lucas, and the defendants-appellees, RCSO officers Charles Metcalf, Matthew Mayer, Larry Faith, and *617 Steven Sheldon, as well as the County of Richland, under 42 U.S.C. § 1983 for numerous claims, including malicious prosecution and fabrication of evidence.
The district court granted summary judgment to the defendants. Ballard and France appeal that decision, arguing that we should infer from the evidence that the RCSO officers knew Bray was using stand-ins to frame them and at times even assisted him in doing so. But Ballard and France have failed to produce evidence showing that the officers personally violated their constitutional rights. In addition, the officers relied on eyewitness identifications of Ballard and France by Special Agent Lucas and indictments from a federal grand jury for probable cause, and Ballard and France have failed to show a genuine issue of material fact as to whether the defendants should have doubted that there was probable cause. For the reasons set forth below, we AFFIRM the district court.
I. Background
A. Operation Turnaround
Lowestco Ballard and Geneva France were separately arrested and charged as part of “Operation Turnaround,” an investigation into the Mansfield, Ohio drug trade launched by the Richland County Sheriffs Office and later joined by the DEA. This case one in a series of lawsuits brought by individuals who were targeted during Operation Turnaround. See Webb v. United States, 789 F.3d 647, 652 (6th Cir. 2015); Robertson v. Lucas, 753 F.3d 606, 610 (6th Cir. 2014).[1] Webb is particularly, relevant because it involved the same controlled buy that led to the prosecution of Geneva France.
RCSO launched Operation Turnaround after the death of Timothy Harris in December 2004, believing Harris’s death to be drug related. As part of the investigation, RCSO recruited Jerrell Bray as a confidential informant to make controlled buys from suspected drug traffickers in Richland County.
In August 2005, the DEA joined Operation Turnaround and DEA Special Agents, including Special Agent Lee Lucas, registered Bray as a DEA informant. Bray had previously made several buys for RCSO, and he had also supplied Lucas with reliable information in a separate DEA drug investigation in Cleveland, Ohio. Controlled buys proceeded as follows:
Bray and the RCSO officers would identify a target and inform the DEA agents, who would supply the buy money and travel from Cleveland to assist. Bray would place a phone call to the target. Investigators would search Bray and his vehicle before the buy and follow Bray to the location of the buy, attempting to view or record the transaction when possible. After the buy, they would follow Bray back to the sheriffs office, search Bray’s person and vehicle, and take a statement from Bray.
Webb, 789 F.3d at 652 (quoting Mott, 524 Fed.Appx. at 181).
Bray worked with several RCSO officers, including Detective Charles Metcalf; his supervisor, Sergeant Matthew Mayer; and their supervisor, the head of the detective bureau, Captain Larry Faith. Faith was supervised by non-defendant Major Reeves, who was supervised by Sheriff Steve Sheldon. As a result of Bray’s controlled buys, law enforcement arrested and *618 prosecuted over two dozen individuals, including Ballard and France.
B. Facts Specific to Lowestco Ballard
Controlled Buy. The controlled buy that led to the arrest and prosecution of Low-estco Ballard took place on September 9, 2005, at Eastgate Apartments. Ballard asserts that Bray purchased crack from Darren Transou (a stand-in), but intentionally misidentified him as Ballard.
According to DEA Special Agent Lucas’s official report, Bray met with Lucas and Detective Metcalf and made a number of calls to Ballard to set up the deal. Bray’s phone records show that he never called the number listed in Lucas’s report. Bray instead called Transou, who needed directions to Eastgate Apartments and at one point referred to “West” (for “Lowest-co Ballard”) in the third person. Detective Metcalf monitored these calls. Sergeant Mayer accompanied Special Agent Lucas in a pick-up truck and provided video surveillance while Bray purchased drugs from Transou.
Transou drove a green Ford Bronco to the September 9 drug buy used to frame Ballard. This is relevant because two days before the buy, on September 7, a state trooper had stopped Transou while he was driving a green Bronco to Detroit to buy drugs. Bray and law enforcement set up this September 7 stop to target Noel Mott and Arrico Spires. Bray had told law enforcement he was following Mott and Spires in a separate vehicle, while Sergeant Mayer was following Bray. Yet when the state trooper stopped the Bronco, he found Transou and Crystal Dillard, rather than Mott and Spires, inside it. The trooper called Metcalf, who was at the police station monitoring the GPS, to tell him Transou was in the green Bronco. The trooper then let Transou go. Ballard points to the September 7 incident as evidence that the green Bronco was a tip-off to officers that Transou, not Ballard, was taking part in the September 9 controlled buy.
Ballard’s Prosecution. Special Agent Lucas testified before a federal grand jury that Ballard sold drugs to Bray on September 9. Ballard was indicted on criminal drug charges and arrested pursuant to a warrant from a United States Magistrate Judge. At trial, Special Agent Lucas was shown Transou’s picture but testified that it was Ballard — not Transou — who sold Bray drugs on September 9. The jury acquitted Ballard and he was released after spending almost a year in pretrial detention.
C. Facts Specific to Geneva France
Controlled Buy. The controlled buy that led to Geneva France’s arrest took place on October 25, 2005, and is also detailed in our opinion in Webb, 789 F.3d at 654-56. France was not the initial target of this buy, as Bray had told law-enforcement officers he could set up a buy with “Ronald Davis.” “Ronald Davis” was an alias used by Herman Price, who had paid his brother-in-law, the actual Ronald Davis, to use Davis’s name, birth certificate, and Social Security card. See Webb, 789 F.3d at 654-55.
Special Agent Lucas and Detective Met-calf recorded and monitored two telephone calls Bray made to Price to set up the controlled buy. At France’s trial, Lucas testified that he “dialed the numbers.” According to Lucas’s DEA report, at 2:05 p.m. Bray made the first call and spoke to a woman known as “Lil S” to discuss purchasing crack cocaine. During the call, Bray and “Lil S” made plans to meet at 121 Glessner Avenue. In truth, Bray called his girlfriend’s cell phone and spoke with his girlfriend, who said she would send “her girl.” Lucas’s report then noted that Bray made a second call to Price (posing *619 as Ronald Davis) to discuss purchasing crack cocaine, and the two planned to meet at 187 South Adams Street. The audio recording reveals that Bray and Price never discussed a drug purchase.
After these calls, Faith and Metcalf drove to Price’s home at 121 Glessner Avenue. According to Lucas’s report and an affidavit Faith would submit for a search warrant of Price’s home, Metcalf and Faith observed Price leave his-home and followed him to 187 South Adams Street. Faith would later admit that he and Metcalf never followed Price to South Adams Street. In the meantime, Lucas and Bray drove to 187 South Adams Street for Bray to meet Price. Inside the house, Bray asked to buy drugs from Price. Price responded “I definitely can get it” and told Bray that he would call him with a price for the drugs.
After returning to the vehicle, Bray told Lucas they needed to go back to Glessner Avenue to buy drugs from “Price’s girl.” Lucas agreed, even though the audio recording shows that Bray and Price never made any agreement for Bray to buy drugs from “Price’s girl.”
At approximately 2:20 p.m., Bray and Lucas picked up Karmiya “Shea Shea” Moxley, whom Bray would falsely identify as Geneva France. Moxley idehtrfied herself as “Lil S,” the woman Bray had supposedly spoken to earlier to set up the buy. Bray told Moxley that Price had asked him to pay her for the drugs. Lucas, who bought the drugs from Moxley, claimed that they were “a little light,” so he asked Bray to call Price and ask him to lower the sales price. Lucas testified at France’s criminal trial that he heard Price on the other line, even though phone records show no calls from Bray’s phone to Price’s number during the buy. Bray later admitted he pretended to dial the phone and had a fake conversation with Price. Faith and Metcalf remained in the field providing surveillance during the buy. They would not have been able to hear whether Bray was actually on the phone with Price.
Prosecution. Metcalf first linked “Lil S” to a woman named Shakkia Gordon. He obtained a photo of Gordon, but Special Agent Lucas denied that Gordon was the woman who sold him drugs. Metcalf then linked “Lil S” to Geneva France after Bray told him that the suspect’s first name was “Geneva.” Law enforcement was unable to find a driver’s license photo of France, but Sergeant Mayer located a sixth grade school photo of France and provided it to Metcalf. Lucas and Bray separately identified the woman in the photo as “Lil S.” Mayer admitted, however, that no one put the photo in a photo array for proper identification, and the photo may have been captioned “Geneva France” when shown to Bray.
Special Agent Lucas testified before a federal grand jury that Geneva France sold him drugs in a controlled buy from Price. Webb, 789 F.3d at 656. France and Price were indicted and charged with distribution of 50 grams or more of crack cocaine distributed within 1,000 feet of school grounds. A magistrate judge then issued a warrant for France’s arrest based on the indictment.
Lucas, Metcalf, and Bray testified against France at trial, and Lucas again identified France as the woman who sold him drugs during the controlled buy. Met-calf testified that he and Faith were about 150 yards away from the vehicle where the buy took place. He testified that he saw an African-American woman enter the vehicle, but that she was too far away to identify. The jury found France guilty on both counts, and she was sentenced to the mandatory minimum of ten years’ imprisonment.
*620 D. Operation Turnaround Falls Apart
The issues with Operation Turnaround went well beyond Ballard’s and France’s investigations:
For example, a stand-in was used to frame ... Dwayne Nabors. Metcalf has admitted that he lied during Nabors’s criminal trial, including admitting to a false identification of Nabors. Ansari also falsely identified Nabors in the alleged drug transaction. Lucas and Met-calf lied to the prosecutor about whether there was video taken of the transaction, although Metcalf himself had operated the video camera.
Bray used the controlled buys to steal money and drugs. [Law-enforcement officers] were aware of this fact yet continued to use Bray as an informant. On one occasion, [DEA Task Force Agents] Verhiley and Ansari caught Bray stealing money given to him for a drug buy. On another occasion, Bray accepted a Buick Cutlass (a car) in lieu of some of the money that was supposed to be paid as part of the drug deal. In effect, Bray was shorting the government the value of the car. Bray, however, was caught on [a] recording discussing the “Cutty.” When Bray was questioned about the conversation, he claimed it was a comment about a “Caddy” (Cadillac) that he had been interested in purchasing, but Lucas stepped in on Bray’s behalf and asserted that “Cutty” was another term for drugs.
Efforts to corroborate Bray’s information were stymied by Bray, and law enforcement disregarded accepted protocol. For example, the first step in a controlled buy was typically a controlled phone call to the target. Appellants produced evidence indicating that Bray dialed identical telephone numbers for unrelated suspects and lied about which suspects he was calling and that the official reports did not accurately reflect the phone conversations Bray had. Bray at times turned off his wireless transmitter during buys. Metcalf also admitted that “the manner in which the Webb deal was conducted violated DEA procedures” and “was not the way that a standard deal should go.”
Webb, 789 F.3d at 652-53 (quoting Robertson, 753 F.3d at 612).
In 2007, Operation Turnaround fell apart. Bray, in prison for an unrelated homicide, disclosed that he had framed targets of Operation Turnaround by using stand-ins to stage drug transactions or by passing off his own drugs as having been purchased from targets under investigation. Robertson, 753 F.3d at 611. “Bray claimed that he initially ... told authorities that [DEA Special Agent] Lucas and [DEA Task Force Agent] Ansari were complicit in his actions, specifically those involving Geneva France and Joshawa Webb.” Id. at 613. Based on the evidence, he did not implicate any of the RCSO officers.
Bray pleaded guilty to two counts of perjury and five counts of deprivation of civil rights. His plea agreement indicated he falsely identified “Lil S” as Geneva France, and that he committed perjury at France’s trial. The government moved to vacate France’s conviction and sentence and dismissed the indictment against her. She spent sixteen months in federal prison. Bray’s plea agreement did not mention Ballard, who had already been acquitted.
In 2009, Metcalf pleaded guilty to falsifying evidence against Dwayne Nabors. Nabors was a plaintiff in this case, but the district court granted summary judgment on his claims to all defendants save Met-calf, and Metcalf and Nabors settled Na-bors’s remaining claims.
The federal government indicted Special Agent Lucas for obstruction of justice, making false statements, perjury, and de *621 privation of civil rights for his role in Operation Turnaround. Robertson, 753 F.3d at 612-13. Bray testified as a witness for the government at Lucas’s criminal trial. While Bray admitted to fabricating evidence against Ballard and France, he stated that no law-enforcement officials, including Lucas, were involved in or aware of his deception. A jury found Lucas not guilty. Robertson, 753 F.3d at 613.
According to our decision in Webb, the Office of the Inspector General (OIG) of the United States Department of Justice completed an independent investigation on Operation Turnaround. 789 F.3d at 653. “Despite the [not guilty] verdict, a 2011 OIG investigation concluded that Lucas • falsified reports and testimony to corroborate Bray’s false identifications.” Id. The OIG report is, however, conspicuously absent from our record in this case.
E. Procedural Background
Ballard, France, and three other individuals targeted in Operation Turnaround filed suit against Bray, DEA Special Agent Lucas, Richland County, and other federal and state law-enforcement officers under 42 U.S.C. § 1983 for civil rights violations. They settled or dismissed their claims against most defendants, including Special Agent Lucas. Bray died in prison in September 2012. Webb, 789 F.3d at 653 n.l. Thus, at the summary judgment stage, the only remaining defendants were Richland County and RCSO officers Metcalf, Mayer, Faith, and Sheldon.
The plaintiffs asserted § 1983 claims for false arrest, malicious prosecution, fabrication of evidence, violations of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), municipal liability under Monell v. Department of Social Services of N.Y.C., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and conspiracy, as well as a separate conspiracy claim under 42 U.S.C. § 1985. On January 4, 2012, the district court granted summary judgment in full to Mayer, Faith, and Sheldon, and in part to Metcalf. Following additional discovery, Metcalf and Richland County' moved for summary judgment. In opposing these summary judgment motions, the plaintiffs submitted an affidavit in August 2012 from Bray to support their allegations that RCSO officers knew Bray was framing the targets of Operation Turnaround. Bray died in prison the next month. Webb, 789 F.3d at 653 n.l. The district court disregarded Bray’s affidavit under the “sham affidavit” doctrine and granted summary judgment in full to Met-calf and Richland County. France v. Lucas, No. 1:07CV3519, 2012 WL 5207555, at *1 (N.D. Ohio Oct. 22, 2012). Ballard and France appealed.
II. Analysis
Ballard and France raise a host of issues on appeal. First, they contest the district court’s decision to apply the “sham affidavit” doctrine to disregard Bray’s affidavit. Second, they appeal the district court’s decision to grant summary judgment on their § 1983 claims against Metcalf, Mayer, Faith, Sheldon, and Richland County for: (1) malicious prosecution; (2) fabrication of evidence; (3) violations of France’s rights under Brady; and (4) municipal liability under Monell. Third, they appeal the district court’s decision to deny their motions for additional discovery. Finally, they appeal the district court’s decision to deny their motion to supplement the record with an expert witness’s affidavit.[2]
*622 A. Bray’s Affidavit
We begin with Bray’s affidavit, which, if admissible, would create issues of fact for many of plaintiffs’ claims. Bray’s affidavit is devoted to asserting that Met-calf, Mayer, Faith, and Lucas were aware Bray was framing people and assisted him in fabricating evidence. It includes specific statements that Metcalf and Mayer knew Bray was framing Ballard and France. The district court declined to consider the affidavit by applying the “sham affidavit” doctrine. France, 2012 WL 5207555, at *3-7. We review that decision for an abuse of discretion. Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 906 (6th Cir. 2006).
Under the sham affidavit doctrine, after a motion for summary judgment has been made, a party may not file an affidavit that contradicts his earlier sworn testimony. Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986). If the affidavit directly contradicts prior sworn testimony, it should be stricken “unless the party opposing summary judgment provides a persuasive justification for the contradiction.” Aerel, 448 F.3d at 908. If the affidavit does not directly contradict prior sworn testimony, it should be stricken if it is “an attempt to create a sham fact issue.” Id. at 908-09 (citation omitted). The rationale behind the doctrine, which is applied in some form in nearly every circuit, is simple: “[i]f a party who has been examined at length [under oath] could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly dimmish the utility of summary judgment as a procedure for screening out sham issues of fact.” Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969); see Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 252 (3d Cir. 2007) (collecting cases).
Bray’s affidavit marks the third different version of his story on Operation Turnaround. When Bray first confessed to framing individuals, he implicated Lucas and DEA Agent Ansari as participants in framing Operation Turnaround targets. There is no evidence that he implicated Metcalfi Mayer, or Faith in his initial story. Then, at Lucas’s criminal trial, Bray told his second version of events and testified that no law-enforcement officers worked with him to fabricate evidence:
Q. And you indicated — today I believe you’re indicating that the stand-in situation was done by you and-you alone, correct?
A. Yes, sir, it was.
Q. Okay. But initially, when you met with the government, you told them that Lucas was involved in each and every stand-in situation, isn’t that true?
A. Yes. Yes, sir.
Q. Why would you do that, sir?
A. Again I was trying to get myself out of trouble, so I was lying, sir.
Q. Did you make any false allegations against any of the Richland County people?
A. I don’t recall.
Q. Didn’t you make false allegations against Mr. Metcalf?
A. I don’t recall.
Q. All right.
A. I was lying at the time so I don’t recall.
App’x at 1221, 1224-26, Bray Testimony at Lucas Trial, R. 120. Bray was a defendant in this lawsuit when plaintiffs filed his affidavit, and the affidavit directly contradicts his 'prior sworn testimony that no law-enforcement officials were involved in-framing the targets of Operation Turnaround. On its face, then, the sham affidavit doctrine appears applicable.
The wrinkle here, however, is that we generally apply the sham affidavit doc *623 trine against a party who attempts to avoid summary judgment by filing his own affidavit that directly contradicts his own prior sworn testimony. See, e.g., Jones v. General Motors Corp., 939 F.2d 380, 385 (6th Cir. 1991) (“[I]t is well settled that a plaintiff may not create a factual issue for the purpose of defeating a motion for summary judgment by filing an affidavit contradicting a statement the plaintiff made in a prior deposition.”) (emphasis added). Ballard and France argue that we should consider Bray’s affidavit because they made no contradictory statements to avoid summary judgment. Rather, they submitted an affidavit from Bray — an opposing party, no less — and therefore the sham affidavit doctrine should not bar its use.
We have yet to confront this unique factual scenario: an affidavit from one defendant, which directly contradicts his pri- or sworn testimony, submitted by the plaintiffs to defeat summary judgment motions from other defendants. The plaintiffs are correct that Reid, which was the genesis of the sham affidavit doctrine in our circuit, involved a plaintiff filing an affidavit that directly contradicted her pri- or deposition testimony. 790 F.2d at 459-60. But they point to no case limiting the doctrine to Reid’s circumstances.
Beyond our own precedent, the Third Circuit has applied the sham affidavit doctrine in circumstances that resemble this case. See Jiminez., 503 F.3d 247. In Jimi-nez, a man died of asphyxia outside a bar after two of the bar’s employees forced him to the ground and held him down. Id. at 248-49. The man’s estate sued the bar and also brought a Monell claim against the local police department, alleging the police had a policy of directing the bar’s employees to detain persons they believed violated the law. Id. at 250. The bar owner testified at his deposition that he did not consult with the police department regarding the bar’s detention policy and that no police official offered training or direction to the bar’s employees. Id. at 250-51. He later submitted a contradictory affidavit stating that the police asked bar employees on several occasions to assist in apprehending individuals. Id. at 250.
The Third Circuit affirmed the district court’s decision to strike the affidavit under the sham affidavit doctrine. Id. at 254-55. The district court noted “that [the bar ownerj’s interests were directly adverse to those of the [police department] for purposes of the [police department]^ motion for summary judgment, as resolution in favor of the [police] would only expose the [bar] to greater potential liability.” Id. at 255. It also observed that the bar owner “offered no explanation for the conflict” between his sworn deposition testimony and his affidavit. Id. The Third Circuit affirmed this reasoning, explaining that “[a] sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment.” Id. at 253.
Bray, just like the bar owner in Jiminez, signed a contradictory affidavit implicating his codefendants. Bray’s affidavit, just like the' bar owner’s, was submitted for the sole purpose of defeating his codefendants’ motions for summary judgment. And Bray’s interests, while perhaps not directly adverse to his codefendants’, were certainly not aligned with them.
We find the rationale underlying the sham affidavit doctrine and the reasoning in Jiminez to be persuasive. First, Bray’s affidavit directly contradicts his sworn testimony at Lucas’s trial in 2011. It is also inconsistent with his 2007 statements to authorities- — -so even when Bray was accusing law-enforcement officials of framing targets, he still did not implicate Metcalf, Mayer, or Faith. Second, while we need *624 not pass on the admissibility of Bray’s affidavit at trial, Bray died within weeks of submitting the affidavit, meaning the defendants would have no opportunity to cross-examine him or test which version of his story is true. Third, the existence of a sham fact issue turns on factors such as “whether the affiant was cross-examined during his earlier testimony” (Bray was) and “whether the affiant had access to the pertinent evidence at the time of his earlier testimony” (Bray did). Aerel, 448 F.3d at 909 (citation omitted).
Finally, the plaintiffs have utterly failed to provide any explanation for the conflict between Bray’s affidavit and his previous testimony at Lucas’s trial. The affidavit is designed to combat the district court’s conclusion that the defendants did not personally violate Ballard’s and France’s constitutional rights.[3] The affidavit’s timing is even more suspicious: while the district court granted summary judgment to Mayer, Faith, Sheldon, and Metcalf (in part) in January 2012, the plaintiffs did not submit Bray’s affidavit until August 2012 — more than seven months later, and almost four years after they first opposed summary judgment.
At oral argument, the plaintiffs argued that we should admit the affidavit because Bray finally decided to “come clean.” They also suggest in their briefs that we should consider the affidavit because it was “damning” to Bray’s case. These arguments fail to account for the questionable circumstances surrounding the affidavit. Bray “came clean” when he admitted to authorities in 2007 that he framed Ballard, France, and other targets of Operation Turnaround. He admitted to framing them again in 2011 at Lucas’s trial, where he also “came clean” by admitting he lied about the involvement of Special Agent Lucas and other law-enforcement officers. The only consistent part of Bray’s ever-changing story is that he was framing people. As Bray already admitted this— twice — the affidavit is not damning to him in the least bit.
The sham affidavit doctrine “invariably reflects] the importance of distinguishing legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact.” Id. at 908. We have a contradictory affidavit, recounting the affiant’s third version of events, submitted not only years after the defendants moved for and the plaintiffs opposed summary judgment, but submitted months after the district court ruled on the summary judgment motions. In these circumstances, we hold that the district court did not abuse its discretion by disregarding Bray’s affidavit.
B. 42 U.S.C. § 1983 Claims
We review the district court’s decision to grant summary judgment de novo. Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 868 (6th Cir. 2007). Summary judgment is proper when “the mov-ant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). We must view the evidence and draw all reasonable inferences in favor of the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The inquiry is whether a reasonable jury could *625 return a verdict for the nonmoving party or “whether it is so one-sided that one party must prevail as a matter of law.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
To prevail on claims under 42 U.S.C. § 1988, a plaintiff must prove that he or she was deprived of a right secured by the Constitution or laws of the United States and that the deprivation was caused by a person acting under color of state law. Webb, 789 F.3d at 659. It is undisputed that the defendants acted under color of state law, so the issue is whether the defendants deprived the plaintiffs of their rights. See Robertson, 758 F.3d at 614.
Qualified immunity is an affirmative defense to § 1983 claims. Binay v. Bettendorf, 601 F.3d 640, 647 (6th Cir. 2010). To determine whether an officer is entitled to qualified immunity, we apply a two-prong test: (1) whether “the facts alleged show the officer’s conduct violated a constitutional right” and (2) whether that right was “clearly established.” Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). We have discretion to address either prong first. Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Once defendants raise the defense of qualified immunity, “the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity.” Binay, 601 F.3d at 647 (internal quotation marks omitted).
Ballard and France appeal the district court’s decision to grant summary judgment to Metcalf, Mayer, Faith, and Sheldon on § 1983 claims for (1) malicious prosecution; (2) fabrication of evidence; (3) Brady violations as to France; and (4) Monell claims against Richland County. We address each in turn.
1. Sheriff Steve Sheldon
Before turning to the plaintiffs’ specific claims, however, we address plaintiffs’ claims against Sheriff Sheldon. “[T]o overcome a qualified immunity defense, an individual must show that his or her own rights were violated, and that the violation was committed personally by the defendant.” Robertson, 753 F.3d at 615. There is no evidence in the record that Sheldon personally violated plaintiffs’ rights. We therefore affirm summary judgment in his favor.
2. Malicious Prosecution
The Fourth Amendment guarantees freedom from malicious prosecution. Sykes v. Anderson, 625 F.3d 294, 308 (6th Cir. 2010). To succeed on a malicious prosecution claim, a plaintiff must prove: (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff’s favor. Id. at 308-09. There is no dispute that Ballard and France were deprived of their liberty and that criminal proceedings were ultimately resolved in their favor, so we address only the first two elements.
Participation. Ballard and France must provide evidence that each defendant personally violated their rights. For malicious prosecution, “the term ‘participated’ should be construed within the context of tort causation principles. Its meaning is akin to ‘aided.’ To be liable for ‘participating’ in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating.” Id. at 308 n.5.
*626 Probable Cause. A malicious prosecution claim under § 1983 fails “when there was probable cause to prosecute.” Stricker v. Twp. of Cambridge, 710 F.3d 350, 365 (6th Cir. 2013) (citation omitted). Probable cause exists when the “ ‘facts and circumstances within the officer’s knowledge’ ” are “ ‘sufficient to warrant a prudent person ... in believing ... that the suspect has committed, is committing or is about to commit an offense.’ ” Id. at 362 (quoting Crockett v. Cumberland Coll, 316 F.3d 571, 580 (6th Cir. 2003)). We must assess the existence of probable cause “ ‘from the perspective of a reasonable officer ... rather than with the 20/20 vision of hindsight.’ ” Radvansky v. City of Olmsted Falls, 395 F.3d 291, 302 (6th Cir. 2005) (quoting Klein v. Long, 275 F.3d 544, 550 (6th Cir. 2001)).
“It has been long settled that the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause.” Barnes v. Wright, 449 F.3d 709, 716 (6th Cir. 2006) (internal citations and quotation marks omitted). And “[a]n eyewitness identification will consti-tuid sufficient probable cause unless ... there is an apparent reason for the officer to believe that the .eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.” Ahlers v. Schebil, 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation marks omitted). An exception to this rule applies when the indictment was obtained wrongfully by police officers who knowingly presented false testimony to the grand jury or who testify with a reckless disregard for the truth. Robertson, 753 F.3d at 616 (quoting Mott, 524 Fed.Appx. at 187); cf. Sykes, 625 F.3d at 305.
Ballard and France were arrested and prosecuted via warrants secured by grand jury indictments. Those indictments were based, in large part, on testimony and eyewitness identifications from Special Agent Lucas. Because probable cause “was established on the basis of a grand jury indictment, [plaintiffs] b[ear] the burden of producing evidence demonstrating that the remaining [defendants] either knew or were reckless in not knowing that Lucas gave false testimony that tainted the finding of probable cause.” Robertson, 753 F.3d at 619.
a. Ballard’s Malicious Prosecution Claims
Special Agent Lucas independently identified Ballard as the man who sold drugs to Bray in his grand jury testimony and at Ballard’s trial. None of the RCSO officers identified Ballard or testified before the grand jury. Lucas’s identification thus provides probable cause — and the defendants are entitled to summary judgment — -unless there is evidence that a reasonable officer in each defendant’s position would have known there was no probable cause to prosecute Ballard.[4] See Robertson, 753 F.3d at 619; Ahlers, 188 F.3d at 370.
i. Ballard’s Malicious Prosecution Claim Against Metcalf
Ballard presents little evidence that Metcalf participated in his prosecution. There is no evidence Metcalf identified Ballard, and he did not testify before the grand jury or at Ballard’s trial. Ballard argues that Metcalf watched the video of *627 the controlled buy, knew what Ballard looked like, and therefore could have corrected Lucas’s identification of Ballard. But there is no evidence in the record, aside from Bray’s stricken affidavit, that Metcalf reviewed the video.
Metcalf did, however, conduct audio surveillance of the buy. Ballard points out that Transou, acting as his stand-in, needed help finding the location for the drug buy at Eastgate Apartments. Ballard asserts that he lived within two miles of Eastgate and would not have needed directions. He also asserts that Transou, pretending to be Ballard, referred to Ballard in the third person. We fail to see how a reasonable officer would know that Tran-sou was not Ballard because he needed directions to an apartment complex. And even assuming a reasonable officer would have noticed Transou’s passing mention of “West” (for “Lowestco” Ballard), that would not be enough to make a reasonable officer doubt Special Agent Lucas’s eyewitness identification of Ballard as the drug dealer.
Finally, Ballard argues that Metcalf made the phone calls to Transou with Bray and must have realized Bray was not calling the number listed in the official report. At his criminal trial, Lucas testified that he and Metcalf would “look at the phone, or the informant would give him the number, they dial the number, or the informant would dial the number, and he was supposed to show you the phone, what number he dialed.” App’x at 2293, Lucas Testimony at Lucas Trial, R. 120. Yet Lucas wrote the DEA report that contains the wrong number. And while we could reasonably infer that Metcalf knew Bray was calling a different number, we cannot make the inferential leap to conclude that a reasonable officer would have known Bray was not calling Ballard.[5] There is also no evidence that the prosecutor relied on the phone number to prosecute Ballard. Accordingly, because Metcalf did not actively participate in Ballard’s prosecution and a reasonable officer would have believed that there was probable cause, we affirm summary judgment to Metcalf on Ballard’s malicious prosecution claim.
ii. Ballard’s Malicious Prosecution Claim Against Mayer
Ballard also offers little evidence that Mayer participated in his prosecution. Mayer provided video surveillance of the buy, but did not identify Ballard and did not testify before the grand jury or at trial. Ballard points out that Mayer was following Bray on September 7, when a state trooper stopped Transou in a green Ford Bronco, and argues that Mayer should have known that Transou was not Ballard when he arrived at the September 9 buy in the same car.
But there is no evidence that Mayer saw Transou during the previous incident. Lucas’s DEA report from the earlier incident did note that Transou had been driving a green Bronco on September 7, but it did not include a description of Transou and it does not suggest that Mayer saw Transou. Lucas testified at Ballard’s trial that on September 9 “Ballard” (Transou) was the third different person law enforcement had seen driving the Bronco, which explains why the September 7 incident raised little suspicion. Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence that might exculpate the accused. Ahlers, 188 F.3d at 371. Thus, because Ballard presented no evidence that a reasonable officer would have doubted Lucas’s *628 identification and the indictment as establishing probable cause, we affirm summary judgment to Mayer on Bray’s malicious prosecution claim.
iii. Ballard’s Malicious Prosecution Claim Against Faith
Ballard did not argue that Faith was involved in his prosecution in the district court, and he makes only a barebones argument here. We therefore affirm summary judgment to Faith.
b. France’s Malicious Prosecution Claims
Special Agent Lucas also identified France, testifying before a grand jury and at trial that she was the woman who sold him drugs. None of the RCSO officers identified France. They were thus entitled to rely on Lucas’s identification and the ensuing indictment for probable cause unless there is evidence that a reasonable officer in each defendant’s position would have known there was no probable cause. See Robertson, Y53 F.3d at 619; Ahlers, 188 F.3d at 370.
i. France’s Malicious Prosecution Claim Against Metcalf
Despite Metcalfs involvement in the investigation that led to France’s arrest, France has not provided evidence that a reasonable officer would have known there was no probable cause for her prosecution. Metcalf provided audio surveillance and security in the field. He also identified Price, and Lucas’s DEA report and Captain Faith’s search warrant affidavit falsely stated that Metcalf and Faith followed Price from his home as he went to meet Bray during the October 25 buy. France points to this evidence and relies heavily on our previous decision in Webb, where we held that Metcalf was not entitled to summary judgment on Price’s malicious prosecution claim. 789 F.3d at 670. According to France, because there was a question of fact for Price, there must also be a question of fact for her.
Despite this case arising from the same facts, Webb does not control our decision because Price’s malicious prosecution claim is distinct from France’s. We denied summary judgment to Metcalf in Webb because Lucas testified that he relied on Metcalfs identification of Price. This “es-tablishe[d] a genuine issue of material fact as to whether Metcalf ... influenced Lucas’s grand-jury testimony and thereby aided in the decision to prosecute Price.” Id. at 666. Here, Metcalf never identified France, and his actions had no impact on Lucas’s grand jury testimony.
Moreover, Webb did not include an individualized inquiry into whether a reasonable officer in Metcalfs position would have believed there was probable cause. Id. at 666. Metcalf saw an African-American woman enter the vehicle for the drug buy, but could not identify her. Lucas, who was in the vehicle, identified the woman as Geneva France and testified before the grand jury and at trial that she sold him drugs. That identification and .the indictment was enough for probable cause. The evidence cited here and in Webb casts doubt only on the probable cause to prosecute Price. Thus, because France has not shown that “her own rights were violated, and that the violation was committed personally by the defendant,” Robertson, 753 F.3d at 615, we affirm summary judgment to Metcalf.
ii. France’s Malicious Prosecution Claim Against Mayer
France has provided no evidence that Mayer participated in her investigation or prosecution. We therefore affirm summary judgment to Mayer.
*629 iii. France’s Malicious Prosecution Claim Against Faith
France’s malicious prosecution claim against Captain Faith mirrors her claim against Detective Metcalf. Faith was in the same vehicle as Metcalf and provided audio and video surveillance during the controlled buy. Three differences make France’s claim against Faith weaker than her claim against Metcalf: Faith did not take part in Bray’s initial phone calls, Faith played no role in identifying France, and Faith did not testify at France’s trial. France argues that a fourth difference is dispositive: Faith admitted that his affidavit in support of a search warrant for Price’s home falsely stated that he and Metcalf saw Price leave his home and followed him as he went to meet Bray during the controlled buy. The government used the search warrant to secure a guilty plea from Price after they searched his home and seized guns and drugs on October 26. See Webb, 789 F.3d at 656. But France was charged and convicted only for the October 25 buy, so the affidavit and search of Price’s home had no impact on her prosecution. As Faith was not a participant in France’s prosecution and had no reason to doubt the existence of probable cause, we affirm summary judgment in his favor.
3. Fabrication of Evidence
An officer violates a person’s constitutional rights when he knowingly fabricates evidence against them and a reasonable likelihood exists that the false evidence would have affected the jury’s decision. Gregory v. City of Louisville, 444 F.3d 725, 737 (6th Cir. 2006). A plaintiff does not need to show that the government lacked probable cause to prevail on a fabrication of evidence claim. Stemler v. City of Florence, 126 F.3d 856, 872 (6th Cir. 1997).
a. Ballard’s Fabrication of Evidence Claims
i. Ballard’s Fabrication of Evidence
Claim Against Metcalf
Ballard’s fabrication of evidence claim against Metcalf follows his malicious prosecution claim. Metcalfs only real involvement was being with Bray when he placed the initial phone calls to Transou. The DEA report listed the wrong number for Ballard, a number Bray never dialed. Although Lucas wrote the report, we could infer that Metcalf knew Bray was calling a different number. Even then, there is no evidence that the number played a meaningful part in Ballard’s prosecution, and the discrepancy between numbers was not “reasonably likely to affect the jury’s decision” in light of the fact that Lucas identified Ballard. See Webb, 789 F.3d at 670 (citing Gregory, 444 F.3d at 737). As such, Metcalf is entitled to summary judgment.
ii. Ballard’s Fabrication of Evidence Claim Against Mayer
Ballard has failed to provide any evidence showing that Mayer fabricated evidence against him. While Mayer recorded the buy that led to Ballard’s arrest, Ballard does not claim that the video was fabricated or altered. Cf Webb, 789 F.3d at 668-69 (denying summary judgment because there was a question of fact as to whether officers tampered with the audio recording of the controlled buy). He is therefore entitled to summary judgment.
iii. Ballard’s Fabrication of Evidence Claim Against Faith
Ballard makes no argument that Faith fabricated evidence against him, so we affirm summary judgment in Faith’s favor. See Robertson, 753 F.3d at 615.
*630 b. France’s Fabrication of Evidence Claims
i. France’s Fabrication of Evidence Claim Against Metcalf
France’s fabrication of evidence claim against Metcalf fails for the same reason her malicious prosecution claim fails: she has not provided evidence that Metcalf fabricated evidence against her, as opposed to Price. France points out that the panel in Webb held that there was a question of fact on Price’s fabrication of evidence claim against Metcalf, but Webb’s holding was based on the false statement that Metcalf and Faith followed Price. Webb, 789 F.3d at 670. As before, we could draw an inference in France’s favor from Price’s claim in Webb. But the false statement that Metcalf and Faith followed Price during the controlled buy would not have been “reasonably likely to affect the jury’s decision” at France’s trial. Id. (citing Gregory, 444 F.3d at 737). Special Agent Lucas, after all, identified France at trial and testified that he personally bought drugs from her. We thus affirm summary judgment to Metcalf on this claim.
ii. France’s Fabrication of Evidence Claim Against Mayer
We affirm summary judgment to Mayer on France’s fabrication of evidence claim because Mayer’s only action in France’s prosecution was to provide Metcalf an accurate, if outdated, photo of France. While we disapprove of the officers’ use of a single photo labeled with a suspect’s name to identify France — particularly a sixth grade photo from years before — the evidence was not fabricated and cannot serve as the basis for a fabrication of evidence claim.
iii. France’s Fabrication of Evidence Claim Against Faith
We affirm summary judgment to Faith on France’s fabrication of evidence claim for the reasons provided on her claim against Metcalf. While Faith admitted that 'he made a false statement in his search warrant affidavit against Price, there is no evidence that he fabricated evidence against France. See Webb, 789 F.3d at 670 (citing Gregory, 444 F.3d at 737).
4. France’s Brady Claim
France also appeals the district court’s decision to grant summary judgment to the individual defendants on her Brady claims. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Brady requires prosecutors and police to turn favorable evidence over to the accused when it is material to either guilt or punishment. Id. at 87, 83 S.Ct. 1194; Moldowan v. City of Warren, 578 F.3d 351, 381 (6th Cir. 2009). Evidence is material when “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). A “reasonable probability” is “a probability sufficient to undermine confidence in the outcome.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The Brady rule extends to evidence that is favorable “either because it is exculpatory, or because it is impeaching.” Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
France claims the defendants failed to disclose, among other things, that Bray was stealing drugs and money; that Bray was using his own drugs in deals; that Bray was using stand-ins; and that Bray was staging phone calls. We have already addressed Bray’s use of stand-ins. Beyond that, evidence of Bray’s misdeeds would have been useful only to impeach Bray. In light of Lucas’s testimony — an eyewitness identification by an experienced DEA agent that France was the *631 woman who sold him drugs — there is little chance the alleged Brady material would have changed the outcome of France’s trial. See Bagley, 473 U.S. at 678, 105 S.Ct. 3375. We therefore affirm summary judgment to the defendants on France’s Brady claims.
5. Monell Claims Against Richland County
Last, Ballard and France appeal the decision to grant summary judgment to Richland County on their Monell claims. Richland County cannot be liable under Monell without an underlying constitutional violation. Robertson, 753 F.3d at 622 (citing Scott v. Clay Cty., Tenn., 205 F.3d 867, 879 (6th Cir. 2000)). Because no constitutional violations occurred, we affirm.
C. Motions for Additional Discovery
Ballard and France, in their briefing and at oral argument, assert that they were unable to present more evidence showing a genuine issue of material fact because the district court did not allow adequate discovery. “The scope of discovery is within the sound discretion of the trial court, and a ruling by the trial court limiting or denying discovery will not be cause for reversal unless an abuse of discretion is shown.” S.S. v. E. Ky. Univ., 532 F.3d 445, 451 (6th Cir. 2008) (citation and internal quotation marks omitted). The plaintiffs’ primary complaint is that they were unable to depose the individual defendants prior to the district court’s first decision granting summary judgment to Mayer, Faith, Sheldon, and Metcalf in part.
In plaintiffs’ first opposition to the individual defendants’ motions for summary judgment, filed October 15, 2008, the plaintiffs requested “limited discovery.” The district court allowed the plaintiffs to take the deposition of the Mansfield Police Chief, but denied all other discovery. The district court then stayed proceedings on February 9, 2009, pending the Department of Justice’s investigation into Operation Turnaround. On August 3, 2009, almost ten months after their opposition to summary judgment and first request for additional discovery, the plaintiffs moved for additional discovery again and requested — apparently for the first time' — to depose Met-calf, Mayer, and Faith. On December 7, 2010, the plaintiffs requested additional discovery yet again. While the district court’s stay of discovery remained in place, the plaintiffs were permitted to supplement the record with the documents and transcripts from Lucas’s criminal trial. These documents included the DEA and RCSO files on Operation Turnaround, as well as the testimony of Bray, Metcalf, Mayer, and Faith at Lucas’s trial.
The district court then issued its first decision, granting summary judgment to Mayer, Faith, and Sheldon, but denying summary judgment in part to Metcalf. Following that decision, the plaintiffs were allowed to conduct limited additional discovery in support of their claims against Metcalf and Richland County, and they took the depositions of Faith and several other RCSO officers. They did not, however, take the depositions of Detective Met-calf, Sergeant Mayer, or Sheriff Sheldon, and the district court went on to grant summary judgment to Metcalf and Rich-land County.
Ballard and Frances’s argument that the district court abused its discretion is unpersuasive on this record. While the plaintiffs were unable to depose the individual defendants, they did not even request to depose Metcalf, Mayer, or Faith until their second request for additional discovery — almost a year after filing their opposition to summary judgment and their first detailed request for discovery. By the time the plaintiffs asked to depose the individual defendants, the vast majority of *632 the information they could hope to gain was available from the officers’ testimony at Lucas’s criminal trial. Then, even after they were permitted to take depositions— and before the district court granted summary judgment to Metcalf and Richland County — the plaintiffs still chose not to depose Metcalf, Mayer, or Sheldon. They have provided no explanation for doing so. Accordingly, we hold the district court did not abuse its discretion in denying additional discovery.
D. Motion to Supplement the Record with Expert Testimony
Finally, Ballard and France appeal the district court’s decision to deny their motion to supplement the record with a declaration from James W. Wheadon prior to the court’s first summary judgment decision. The plaintiffs sought to add the declaration of Wheadon, a purported expert witness experienced in working with confi- ' dential informants, to “show[ ] that reasonable, trained, supervisors and officers who followed the generally accepted procedures in using confidential informants, could not help but be aware of the sort of misconduct that is alleged to have occurred during ‘Operation Turnaround.’ ” R. 145, Motion to Suppl. Record at 3-4, PID 5618-19.
The district court denied the motion for two reasons. First, plaintiffs submitted the expert testimony “months after the summary judgment deadline with no good cause demonstrated for [their] tardiness.” R. 151, Dist. Ct. Op. at 43, PID 5719. Second, Wheadon’s declaration was “irrelevant in that it attempts to offer opinion evidence on what is a matter of law for the court to decide — whether qualified immunity applies, or must be denied because Defendants’ conduct violated some clearly-established constitutional or federal statutory right.” Id.
We agree with the district court’s reasoning. Ballard and France have provided no explanation for offering this testimony so long after the summary judgment deadline. And, “[a]lthough expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimately legal issues.” Williams v. Ford Motor Co., 187 F.3d 533, 543 (6th Cir. 1999) (citation and internal quotation marks omitted). Wheadon’s declaration consists of his opinion on how a “reasonable” or “reasonably trained” officer would have acted in the individual defendants’ positions. We hold the district court did not abuse its discretion in denying the motion to supplement the record with that declaration.
III. Conclusion
Operation Turnaround was an embarrassment and a stain on. the Richland County Sheriffs Office, the DEA, and law enforcement in general. Lowestco Ballard and Geneva France should never have been forced to spend months in prison for crimes they did not commit. Yet in a suit under 42 U.S.C. § 1983, plaintiffs must provide evidence that each individual defendant personally violated their rights. The plaintiffs have not provided that evidence with respect to Metcalf, Mayer, Faith, or Sheldon, and so those officers and Richland County cannot be liable under § 1983. Accordingly, and for the reasons set forth above, we AFFIRM.

. See also Brown v. United States, 545 Fed. Appx. 435 (6th Cir. 2013); Mott v. Mayer, 524 Fed.Appx. 179 (6th Cir. 2013); Lee v. Lucas, No. 1:10CV00151, 2013 WL 5670930 (N.D. Ohio Oct. 15, 2013); Williams v. Lucas, No. L10CV615, 2011 WL 4632883 (N.D. Ohio Sept. 30, 2011); Westerfield v. Lucas, No. 1:07CV3518, 2011 WL 1831676 (N.D. Ohio May 12, 2011).

. The plaintiffs purport to appeal the district court’s denial of their motion to file a second amended complaint, Appellants Br. at 8, but they do not raise the argument in their briefs and have therefore forfeited it.

. While we do not weigh the evidence in the affidavit, we do note than many of the allegations in the affidavit are unsupported by the record. For example, the affidavit alleges that Mayer videotaped the drug buy used to frame Geneva France. Yet there is no evidence — not in.our record, not from our previous decision in Webb involving the same buy, not from France’s trial, not from Lucas's trial, and not from any of Bray’s previous versions of events — that a video of that drug buy even exists.

. -While the dissent would leave the question of whether a reasonable officer would believe there was probable cause to the factfinder, the Supreme Court has "reject[ed] the argument that the question of objective reasonableness is a 'question of fact best reserved for a jury.' ” Dunn v. Matatall, 549 F.3d 348, 353 (6th Cir. 2008) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

. The defendants asserted at oral argument that the targets of Operation Turnaround were using burner phones.