NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0176n.06

Case No. 25-1986

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Apr 17, 2026

KELLY L. STEPHENS, Clerk

TRIPLE PROPERTIES DETROIT, LLC,

    Plaintiff-Appellant,

v.

FIRST AMERICAN TITLE INSURANCE
COMPANY,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

OPINION

Before: STRANCH, BLOOMEKATZ, and HERMANDORFER, Circuit Judges.

HERMANDORFER, Circuit Judge. In 2011, Triple Properties Detroit, LLC purchased undeveloped units that were part of a condominium-development project. But Triple knew its title came with a March 2014 deadline to either (1) complete development or (2) withdraw any undeveloped units from the project. If Triple failed to do so, its title to the units would revert to the condominium association. That transfer of title came to pass when the early-2014 deadline came and went without Triple acting to protect its interest in the units. Still, Triple later purported to sell the units to a third-party buyer. Litigation ensued, and Triple sought defense coverage from its title insurer, First American Title Insurance Company. First American denied Triple's claim as falling within a policy exclusion. Disagreeing, Triple filed its own suit against First American for breach of contract. The district court granted summary judgment to First American. We affirm.

I

Westminster Abbey Homes, LLC executed a Master Deed for the Richard Rowhouses Condominium Project (the Project) in 2003. Relevant here, the Master Deed contained language tracking a then-operative provision of Michigan's Condominium Act, Mich. Comp. Laws § 559.167(3). The clause at issue stated that "if the Developer has not completed" construction of the entire Project "during a period ending 10 years from the date of commencement or construction by the Developer of the Project, the Developer, its successors, or assigns have the right to withdraw from the Project all undeveloped portions of the Project." Master Deed, R.28-2, PageID 614. The Master Deed continued: "If the Developer does not withdraw the undeveloped portions of the Project from the Project before the expiration of the time periods, such lands shall remain part of the Project as General Common Elements and all rights to construct Units upon that land shall cease." *Id.* Put simply, any developer's rights in remaining undeveloped units, if not completed or withdrawn from the Project within a 10-year period, were to revert to the Richard Rowhouses Condominium Association (the Association).

On March 16, 2004, Westminster filed a notice that it was beginning development on the Project—thus starting the 10-year clock. After Westminster defaulted on a mortgage in 2008, Bank of America, N.A. acquired title to the 14 undeveloped units via a sheriff's deed after a foreclosure sale. Triple—a local subsidiary of a family-owned holding company that controlled properties in "pretty much every state" and throughout Canada, Apostolopoulos Dep., R.28-5, PageID 661-62—subsequently bought those undeveloped units from Bank of America in October 2011. Triple "was aware of the Master Deed when it acquired" the undeveloped units. Resp. to Req. to Admit, R.28-3, PageID 634.

Shortly after Triple purchased the undeveloped units, it acquired an owner's policy of title insurance issued by First American Title Insurance Company. The policy insures Triple against loss or damage sustained "by reason of" "[t]itle being vested other than" as "Fee Simple." Title Ins. Policy, R.28-16, PageID 739, 742. But the policy contains several exceptions and exclusions from coverage. Of note, Exclusion 3(a) states that First American "will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of . . . [d]efects, liens, encumbrances, adverse claims, or other matters . . . created, suffered, assumed, or agreed to by" Triple. *Id.* at PageID 743.

The Master Deed's 10-year deadline elapsed in March 2014. Yet Triple neither completed construction on the undeveloped units nor withdrew them from the Project. By the terms of the Master Deed and Michigan law, that meant Triple's rights in the units reverted to the Association. Mich. Comp. Laws § 559.167(3) (2002).

Still, in 2015, Triple agreed to sell the undeveloped units to Ferlito Group. But Ferlito's lawyers discovered that the units had "legally reverted" to the Association "pursuant to the terms of the Master Deed and MCL 559.167." Letter to Ferlito, R.28-19, PageID 780. In other words, Triple no longer owned any rights to construct the units. So Ferlito negotiated directly with the Association, seeking to amend the Master Deed to reinstate the units and permit Ferlito to develop them. At Ferlito's request, the Association sent all property owners a letter explaining Ferlito's proposal and suggesting that they vote to adopt an amendment to the Master Deed in December 2016. That amendment explicitly stated that its purpose was to "reinstat[e]" Triple's undeveloped units that had reverted to the Association "by virtue of" the Master Deed and Michigan law. Letter re: Amend., R.28-22, PageID 806.

A real-estate broker had previously informed Triple's manager and an attorney for Triple of the proposed amendment. The Association also sent Triple a copy of the December 2016 letter and a ballot to vote on the proposed amendment. Though the amendment would have reinstated Triple's undeveloped units and solved any title problem, Triple voted against amending the Master Deed. Triple's deal with Ferlito later fell apart for other reasons.

Three years later, Triple tried again to sell the undeveloped units in the Project. Its targeted buyer was PCJ Investments, LLC. Before closing, PCJ sought to clarify whether there was "a timeline to finish off the building," because the "deed office mentioned that some developments have a hard time line as to when developments need to be started and finished." Email from PCJ to Triple, R.28-26, PageID 827. Triple never responded to that email. And it did not inform PCJ that the Association had claimed ownership of the undeveloped units during the Ferlito negotiations. PCJ went on to purchase the undeveloped units from Triple in November 2019.

Things came to a head in April 2021. At that point, the Association informed PCJ that the undeveloped units had reverted to the Association by operation of the Master Deed and Michigan law, that PCJ did not hold any interest in the units, and that PCJ was prohibited from developing the units. PCJ sued the Association and Triple in state court, seeking (among other things) to quiet title in its favor or to recover the purchase price of the units.

Triple turned to First American, asserting that its title-insurance policy required First American to provide defense coverage for Triple in PCJ's lawsuit. First American declined. As a basis for denying coverage, First American asserted that PCJ's claims fell within the exclusions to coverage listed in Triple's policy.

In response, Triple brought this action against First American. Triple alleges that First American breached the insurance policy by refusing to defend Triple in the PCJ lawsuit. Triple

seeks approximately $400,000 in damages—covering costs and attorneys' fees Triple has incurred in defense of the PCJ lawsuit. After receiving cross-motions for summary judgment, the district court granted summary judgment to First American. The district court concluded that Exclusion 3(a) of the policy barred coverage for Triple's claim because the "loss of title was the direct result of Triple's deliberate acts." Sum. Judg't Op., R.41, PageID 1551.

Triple appealed. We review the district court's grant of summary judgment de novo and "view the evidence and draw all reasonable inferences" in Triple's favor. *France v. Lucas*, 836 F.3d 612, 624 (6th Cir. 2016).

## II

### A

We agree with the district court that First American is entitled to summary judgment. Triple's title-insurance policy—via Exclusion 3(a)—excludes from coverage any "[d]efects, liens, encumbrances, adverse claims, or other matters" that Triple "created, suffered, assumed, or agreed to." Title Ins. Policy, R.28-16, PageID 743. That language applies and bars Triple's claim.

All agree that Michigan law governs Triple's suit. Under Michigan law, "[t]he rules of contract interpretation apply to the interpretation of insurance contracts." *McGrath v. Allstate Ins. Co.*, 802 N.W.2d 619, 621 (Mich. Ct. App. 2010). We must "enforce clear and unambiguous language" in a contract "as written." *Tuscany Grove Ass'n v. Peraino*, 875 N.W.2d 234, 237 (Mich. Ct. App. 2015). We interpret any undefined words in Triple's insurance policy "according to their plain and ordinary meaning." *Id.* And we construe any "ambiguity" against First American as the insurer. *McGrath*, 802 N.W.2d at 622.

We do not work on a blank slate in interpreting Exclusion 3(a). In *American Savings & Loan Ass'n v. Lawyers Title Insurance Corp.*, this Court observed that the meaning of the phrase

"created, suffered, assumed or agreed to" in insurance contracts is "fairly well established" across jurisdictions. 793 F.2d 780, 784 (6th Cir. 1986). "The term 'created,'" for its part, "has generally been construed to require a conscious, deliberate and sometimes affirmative act intended to bring about the conflicting claim, in contrast to mere inadvertence or negligence." *Id.* (citation omitted). The word "'suffered' . . . has been deemed synonymous with 'permit,' which implies the power to prohibit or prevent the claim from arising." *Id.* (citation omitted). "'Assume,' . . . requires knowledge of the specific title defect assumed." *Id.* "And 'agreed to' . . . requir[es] full knowledge by the insured of the extent and amount of the claim against the insured's title." *Id.*

That Exclusion 3(a) language fits Triple's conduct to a T. The core of Triple's claim, as pled below, is that First American owed a duty to defend Triple against PCJ's lawsuit. That PCJ suit in turn arose because Triple lacked title to the property it purported to sell to PCJ. Triple's title defect followed from the plain terms of the Master Deed. And Triple admitted "that it was aware of the Master Deed when it acquired" the undeveloped units. Resp. to Req. to Admit, R.28-3, PageID 634.

We therefore agree with the district court that Triple "suffered" the expiration in its ownership interest that gave rise to PCJ's claim: Triple had "the power to prohibit or prevent" the reversion of its interest but failed to undertake the actions necessary to do so. *Am. Savs. & Loan Ass'n*, 793 F.2d at 784; *see also Suffer*, Black's Law Dictionary (12th ed. 2024) ("To allow or permit (an act, etc.)"); *Archambo v. Law. Title Ins. Corp.*, 2002 WL 31013194, at *1 (Mich. Ct. App. 2002) (similar). Triple could have developed the units upon their acquisition in 2011. But Triple instead made "a business decision" to "hold" the undeveloped units, based on its assessment that "market conditions were not right to build at that time." Apostolopoulos Dep., R.28-5, PageID 665, 668-69; *see also* Interrog. Resp., R.28-10, PageID 707. Alternatively, Triple could have

"withdraw[n] the undeveloped portions . . . from the Project" before the March 2014 deadline elapsed. Master Deed, R.28-2, PageID 614. But Triple didn't do that either. And even after title reverted to the Association in 2014, Triple had a third way to restore its rights in the undeveloped units: amending the Master Deed. Yet Triple voted against doing so.

Separate from Triple's failure to protect its ownership interest, Triple "created" PCJ's "conflicting claim." *Am. Savs. & Loan Ass'n*, 793 F.2d at 784 (citation omitted). By 2019, Triple knew that its title to the undeveloped units was disputed. Yet Triple purported to sell the undeveloped units to PCJ anyway, without alerting PCJ to the Association's title claim. Triple thus took the "conscious, deliberate . . . affirmative act" of selling the undeveloped units to PCJ, *id.*, even though Triple knew (i) that the Association had asserted an ownership interest in the units, and (ii) that an earlier interested buyer, Ferlito, had flagged Triple's title problem. Under Exclusion 3(a), Triple cannot offload responsibility for PCJ's lawsuit when it was Triple's own "deliberate" acts—done with "full knowledge" of the cloud on its title—that "br[ought] about" the lawsuit to begin with. *Id.*

In short, as the district court properly concluded, Triple's claim for coverage under the title policy for the PCJ lawsuit fails under the plain terms of Exclusion (3). So any losses Triple incurred by defending the PCJ lawsuit fall on it, not First American.

B

Triple's counterarguments are not persuasive.

*First*, Triple argues that First American had a duty to defend Triple in the PCJ lawsuit, because an "insurer must provide a defense" whenever "the allegations of a third party against the policyholder *even arguably* come within the policy coverage." *Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 481 (Mich. 1996) (emphasis added). Even so, "[a]n

insurer is not required to defend its insured against claims specifically excluded from policy coverage." *Am. Bumper & Mfg. Co. v. Nat'l Union Fire Ins. Co.*, 683 N.W.2d 161, 165 (Mich. Ct. Ap. 2004). And although exclusions from coverage must be "strictly construe[d] against an insurer," "courts cannot create ambiguity where none exists." *Marlo Beauty Supply, Inc. v. Farmers Ins. Grp.*, 575 N.W.2d 324, 328 (Mich. Ct. App. 1998). Instead, "[c]lear and specific exclusions must be given effect." *Id.* For the reasons already explained, Exclusion 3(a) clearly and specifically excludes Triple's claim from the policy's coverage, so First American had no duty to defend. *Id.*

*Second*, Triple asserts a broader argument beyond First American's obligation vis-à-vis the PCJ lawsuit. Reaching back to 2011, Triple argues for the first time on appeal that First American "breached the Policy" "*on the date*" it was issued because the policy "insured against title being vested other than as fee simple, and title was not so vested." Triple Br. 16-17. But Triple's summary judgment brief did not meaningfully press this distinct theory of breach below. Instead, it framed all of First American's obligations as relating to its duty to defend PCJ's lawsuit. That theory fails for reasons already discussed.

Nor does Triple's broader breach theory fare well on its own terms. By Triple's own contention, First American's fee-simple-based breach "existed at the time the Policy was issued" in 2011. Reply Br. 4. But under Michigan's six-year statute of limitations for contract claims, Triple's 2024 challenge to the alleged 2011 breach came more than six years too late. *See Scherer v. Hellstrom*, 716 N.W.2d 307, 310 (Mich. Ct. App. 2006); Mich. Comp. Laws § 600.5807(9). In all events, Triple has not explained why the fee-simple descriptor trumps the language of Exclusion 3(a).

*Third*, Triple argues that the balance of the equities supports a finding in Triple's favor. But under Michigan law, courts are "without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005); *see also Kendzierski v. Macomb County*, 931 N.W.2d 604, 612-13 (Mich. 2019). As discussed, Exclusion 3(a) of Triple's title insurance policy is clear: It excludes coverage of Triple's claim because the title defect and consequent PCJ lawsuit were of Triple's own making—Triple "created, suffered, assumed, or agreed to" the title defects it now challenges. Title Ins. Policy, R.28-16, PageID 743. That unambiguous Exclusion 3(a) contractual provision controls. Nor does Triple—which sold the undeveloped units to PCJ without disclosing a known competing claim to its title—seem well positioned to press equity-based points. *C.f. Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).

\* \* \*

We affirm the judgment of the district court.