NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0010n.06

Nos. 22-2050/2122

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

LAMARR MONSON,

      Plaintiff-Appellee,

v.

CITY OF DETROIT, MICHIGAN, et al.,

      Defendants,

JOAN GHOUGOIAN and CHARLES BRAXTON (23-2050); BARBARA SIMON and VINCENT CROCKETT (22-2050/2122),

      Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

Jan 08, 2024

KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: SUTTON, Chief Judge; STRANCH and MATHIS, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Lamarr Monson brings this § 1983 case following his 2017 release from prison after serving 20 years for murder. In 1997, a jury convicted Monson of murdering 12-year-old Christina Brown, and the court sentenced him to 30 to 50 years in prison. In 2012, the Michigan Innocence Clinic undertook a review of Monson's case that continued through 2017 and uncovered a series of irregularities in the police investigation along with evidence implicating a different perpetrator. In 2017, a Michigan state circuit court judge granted Monson's motion for a new trial, the county prosecutor decided not to retry Monson, and the circuit court entered an order dismissing the case.

On February 23, 2018, Monson filed this § 1983 case against the City of Detroit, the Detroit Police Department, and individual named officers, alleging violations of his constitutional right in their actions leading to his conviction for murder. The district court narrowed the parties and issues leaving as defendants Officers Vincent Crockett, Charles Braxton, Barbara Simon, and Joan Ghougoian. The parties ultimately filed cross motions for summary judgment. The district court largely granted Monson's motion, and largely denied the Officers' motion, precluding a grant of qualified immunity. The Officers filed this interlocutory appeal challenging the district court's denials of qualified immunity. For the reasons stated below, we **AFFIRM IN PART AND REVERSE IN PART.**

## I.   BACKGROUND

### A.   Factual Background[1]

This appeal centers on a 1996 murder. In late 1995, Lamarr Monson began regularly selling drugs out of an abandoned apartment (Apartment 7A) on West Boston Street. Monson resided with his parents, not at Apartment 7A. He sometimes went by the name "Marc Mason." In June of 1996, 14-year-old Cynthia Stewart, sometimes known as Paris Thompson, introduced Monson to Christina Brown, a runaway 12-year-old girl who, at five-feet, ten-inches tall, reportedly appeared grown. Brown, who ran away from home in early January 1996, began spending time with Monson at the apartment, and she became involved in his drug sales.

On January 19, 1996, the day before she was murdered, Brown was at Apartment 7A when Monson left to spend the night at the home of his daughter's mother, Tawanna Crawford. Monson returned to the apartment building the next day around 1:30 or 2 p.m. When he arrived, Linda

---

[1] This background includes information as developed by the Detroit police at the time of the 1996 murder. As noted, the Michigan Innocence Clinic began an investigation in 2012 that uncovered other significant evidence. The latter evidence is also included with reference to the later dates of its disclosure.

Woods, a resident of the building, and Robert Lewis, who also went by his brother's name, Raymond, informed him that the door to 7A was open, but no one answered when they called. Monson, Lewis, and Woods entered the apartment and found Brown on the bathroom floor with a swollen head, face, and neck; hands covered in cuts; face covered in dried blood; and blood covering the surface of the shower, bathroom walls, and a shattered window. Brown waved her arms at Monson but could not speak.

"Hysterical," Monson immediately ran to the apartment next door and banged on the door, seeking help. When the occupant of that apartment opened the door, Monson asked him to call emergency services (EMS). Because the apartment lacked a telephone, Monson drove to his sister's house two blocks away and called EMS, and then returned to Apartment 7A, where he placed a blanket around Brown. When Brown appeared to stop breathing, Monson began performing chest compressions.

Around 2:10 p.m., Officers Crockett and Wilson arrived at the apartment building, and Monson met them at the entrance and directed them to Apartment 7A, where a few other building tenants, including Woods and Lewis, remained. Robert Lewis identified himself as Raymond Lewis. Crockett and Wilson instructed everyone at the scene to remain, and Monson complied. EMS arrived at the scene and transported Brown to the hospital, where she was pronounced dead on arrival. Her cause of death was listed in the preliminary police complaint and emergency room records as "stabbing."

Before 3:00 p.m., officers transported Monson, Lewis, and Woods to the Homicide Department Headquarters of the Detroit Police Department. Around 3:25 p.m., Barbara Simon, an officer with the Homicide Department, informed Monson of his constitutional rights, including his right to an attorney, and gave him a constitutional rights certificate of notice, which Monson

signed "Marc Mason." While Simon read Monson his rights, Monson asked, but was not allowed, to use the telephone. Simon questioned Monson for over four hours and repeatedly asked about the nature of Monson's relationship with Brown. Around 7:45 p.m., Simon drafted a statement for Monson to sign, which included a statement that Monson once had sex with Brown. It omitted, however, that Monson had spent the preceding night with Crawford. Only after Monson signed the statement did he get access to a telephone to call his parents.

Monson told his parents that he needed a lawyer, and was then escorted to a holding cell on the ninth floor. At approximately 5:30 a.m. the next morning, after sleeping approximately four hours, officers removed Monson from the holding cell and took him to the office of the Chief Inspector of the Homicide Department, Joan Ghougoian. At this point, Monson had not had anything to eat since the day prior and had little sleep. Ghougoian told Monson that police "had a stack of evidence against [him]," and were "going to charge [Monson] with first degree murder." She then said that "she wanted to help [Monson]," and stated that if Monson "were to do another statement, or sign a[n] information summary . . . she could have [him] home by that time tomorrow." Ghougoian raised "the need for a self-defense scenario," asking Monson, "do you want to get charged, or do you want to go home[?]" Monson responded that he "want[ed] to go home," and agreed to sign Ghougoian's proposed statement.

Around 8:25 a.m., Charles Braxton, a sergeant with the Department, arrived at Ghougoian's office to take a second statement from Monson. While Braxton typed the statement, he read from another piece of paper. Ghougoian also came "in and out of the room" and spoke with Braxton while he prepared Monson's statement. Monson sat "there [a]sleep, half [a]sleep, laying on the desk." Braxton questioned Monson and typed his responses. This second statement reflected the "scenarios" Ghougoian discussed with Monson. In this second statement, Monson

said he came home early the morning of January 20 after a night of drinking and got into a lovers' quarrel with Brown, which culminated in Brown charging at Monson with a knife, Monson grabbing Brown and pushing her head through the window, and Monson inadvertently pushing the knife in Brown's hand away from himself and into Brown's neck. Once Braxton finished the statement, he handed it to Monson, who signed his name and initialed where Braxton indicated. The next day, January 22, Monson was arraigned in Michigan state court on a charge of first-degree murder.

Evidence subsequently uncovered included a 2012 statement given by Shellena Bentley, who lived in the apartment building. Bentley recounted that on January 19, 1996, she and her boyfriend, Robert Lewis, decided to use drugs. Lewis made several trips to Apartment 7A to purchase drugs from Brown. After the last trip, early in the morning "between 4 and 5 AM" on January 20, Lewis returned to Bentley's apartment with his arm "scratch[ed]" and "covered in blood," and "his clothes were bloody." When Bentley asked him what happened, Lewis responded that he "had to kill that b----h" because she scratched [him]." Bentley said that Lewis forced her to leave their apartment, took her to her mother's house, and threatened to kill her and her children if she ever told anyone what happened. She said that she was coming forward in-person in July 2012 because she had learned that Lewis and his brother had moved out of state. In December 2014, an officer from the City's Homicide Department conducted a telephone interview with Bentley, during which Bentley again stated that on January 19, 1996, Lewis returned from attempting to procure drugs at Apartment 7A with "blood" on his body and clothes, and stated "he th[ought] he killed the girl." During her 2018 deposition in this case, Bentley stated that she called the police at least twice within the first year after the murder to attempt to report what she observed on January 20, 1996.

On January 20, the day of Brown's death, Simon, Crockett, and other unknown officers questioned other potential witnesses, including Brown's young friend, Cynthia Stewart. Stewart signed a statement saying that Monson and Brown were living together and that Brown sold drugs for Monson. The statement also said that Monson had threatened Brown's life about a month before her death after someone stole drugs from Brown while Monson was away from the apartment, and that Monson regularly carried a knife.

Evidence obtained from the scene included the bloody top of the toilet tank wrapped in a mattress cover on the bedroom floor, on which investigators found Brown's fingerprint and other unidentified—but usable—fingerprints, as well as a palm print. Simon received these results on January 25, 1996. When asked during her 2019 deposition for this case whether she informed the prosecutor of "the fingerprint on the probable murder weapon that was not [Monson's]," Simon responded, "I don't recall."

On February 1, 1996, the medical examiner released his report on Brown's death, determining that injuries to Brown's skull and brain, not stabbing, caused her death. Monson moved to suppress his second statement, and on May 17, 1996, the state trial court held a hearing where Monson testified that Ghougoian told him he could go home if he signed the statement, and Braxton testified that Monson's statement was voluntary. The court denied the motion.

Trial commenced on March 3, 1997. The prosecution called Stewart as a witness, and she testified that Monson and Brown lived together and that Brown sold drugs for Monson. When the prosecution recalled Stewart to the stand, she initially testified that she was not aware of Monson threatening Brown. The prosecution refreshed Stewart's recollection with her 1996 statement, at which point, Stewart said that Brown "did tell [her] that [Monson] had threatened her after the

robbery." The jury found Monson guilty of second-degree murder on March 7, and the trial court sentenced Monson to 30 to 50 years in prison.

Based on the Innocence Clinic's work, on September 27, 2016, the state court ordered police to analyze the toilet tank top; the report determined that the two unidentified fingerprints belonged to Lewis, and none of the prints matched Monson's. On January 30, 2017, the trial court judge granted Monson's motion for a new trial. On August 25, 2017, the county prosecutor dropped the case against Monson, and the court entered an order dismissing the case. After spending more than 20 years in jail, Monson was released.

### B. Monson's § 1983 Case

On February 23, 2018, Monson filed this action under 42 U.S.C. § 1983 against the City of Detroit, the Detroit Police Department, and individual named officers alleging violations of his constitutional rights. Defendants moved to dismiss, and in 2019, the district court granted the motion as to the City and the Department, but denied it as to the individual defendants: Officers Charles Braxton, Vincent Crockett, Barbara Simon, Joan Ghougoian, and Jerome Wilson.[2]

Discovery commenced. Cynthia Stewart was deposed regarding here statement and testimony in Monson's case and explained that on the day of Brown's murder she was drunk, and two or three male police officers handcuffed her and transported her to the station. Two or three male officers—Stewart could not recall whether they were the same officers who drove her to the station—showed her a clear bag containing Brown's bloodied clothes, threatened her with "jail maybe or [that she would] end up like that, like [her] friend"; and told her that Brown and Monson had been selling drugs together—which Stewart denied having known at the time because she and Brown "had not seen each other for so long." She described the experience as "really, really

---

[2] The court subsequently granted Wilson's motion for summary judgment, removing him from this case.

scary," and "very terrifying," and said that the officers "intimidated" her. Stewart testified that during the state court trial, police told her what to say on the stand, and Stewart complied because she understood that "if I did not want to go to jail or end up like [Brown], I needed to say that I s[aw] things that I didn't." Additionally, Stewart stated that she did not recall Brown ever telling her that Monson threatened to kill Brown. She also described Monson and Brown's relationship as a friendship, not romantic or sexual. Stewart denied that the handwriting and signature on the 1996 statement were hers.

The parties filed cross-motions for partial and complete summary judgment. At argument, the court held that triable issues of genuine fact precluded granting qualified immunity on claims against Officers Crockett, Simon, Ghougoian, and Braxton. The court also memorialized its determinations in a written order. Monson responded to the court's invitation to provide record citations to support his fabrication of evidence claims related to Stewart's statement. The court found that:

> [T]he following claims survive [summary judgment]: (1) a federal malicious-prosecution claim and a fabrication-of-evidence claim against Crockett; (2) a federal malicious-prosecution claim, a claim for violations of *Brady v. Maryland*, and a fabrication-of-evidence claim against Simon; (3) a federal malicious-prosecution claim, a coerced-confession claim, and a fabrication-of-evidence claim against Ghougoian; and (4) a federal malicious-prosecution claim and a fabrication-of-evidence claim against Braxton.

R. 397 at PageID 22387. Defendants filed an interlocutory appeal of the denial of qualified immunity.

## II. ANALYSIS

### A. Jurisdiction and Standard of Review

This court has jurisdiction over appeals from "final decisions of the district courts[.]" 28 U.S.C. § 1291. "Interlocutory appeals of the denial of qualified immunity at the summary

judgment stage are considered 'final decision[s]' within the meaning of 28 U.S.C. § 1291." *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). "Our jurisdiction, however, is limited to legal questions because 'circuit courts can review a denial of qualified immunity only to the extent that it turns on an issue of law.'" *Id.* (quoting *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016)).

We review a district court's denial of qualified immunity de novo. *See Peterson v. Heymes*, 931 F.3d 546, 553 (6th Cir. 2019). As to the facts, "'we follow the same path as did the district court' by 'drawing all reasonable inferences in the plaintiff's favor—and, ideally . . . look[ing] no further than the district court's opinion for the pertinent facts and inference.'" *Raimey*, 77 F.4th at 445 (quoting *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018)). "Where the parties ask us to resolve factual disputes, we set those issues aside for resolution by the trial court." *Moldowan v. City of Warren*, 578 F.3d 351, 371 (6th Cir. 2009). We lack jurisdiction over "the district court's determination of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial," as the fact-bound nature of that inquiry means it is "not an appealable 'final decision' within the meaning of 28 U.S.C. § 1291." *Thompson v. City of Lebanon*, 831 F.3d 366, 370 (6th Cir. 2016) (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). "[W]e do not ourselves make any findings of fact or inferences for purposes of any subsequent proceedings." *Bunkley v*, 902 F.3d at 561 (collecting authorities).

**B.    Qualified Immunity**

"Qualified immunity protects governmental officials from suit as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Raimey*, 77 F.4th at 448 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome qualified immunity at summary judgment, a plaintiff bringing a § 1983 case

against state officials must demonstrate that "(1) the defendant violated a constitutional right and (2) that right was clearly established." *Thompson*, 831 F.3d at 369. "[T]he only issues appropriate for review are those that are 'strictly legal.'" *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 602 (6th Cir. 2005) (quoting *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004)). "Nonetheless, we may decide a challenge 'with any legal aspect to it,' even if the appellant makes improper fact-based arguments." *Raimey*, 77 F.4th at 448. Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in [his] favor." *Hicks v. Scott*, 958 F.3d 421, 430 (6th Cir. 2020).

A two-step analysis applies. First, we determine "whether the facts, 'when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right.'" *Raimey*, 77 F.4th at 448 (quoting *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015)). We then ask "whether the right was 'clearly established' such 'that a reasonable officer would understand that what he is doing violates that right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). We may "exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Defendants appeal the denial of qualified immunity on the following claims: (1) federal malicious prosecution against Officers Crockett, Simon, Ghougoian, and Braxton; (2) fabrication of evidence against the same four officers; (3) a *Brady* claim against Simon; and (4) a coerced confession claim against Ghougoian.

### 1.      *Probable cause and federal malicious prosecution*

Our jurisdiction over an interlocutory appeal of denial of qualified immunity is limited to "defendants' claims to qualified immunity"; in this posture, we cannot exercise supplemental jurisdiction "over the remainder of the defendants' claims on appeal." *Bunkley*, 902 F.3d at 561. Defendants argue that the district court erred in determining that, "as a matter of law, there was no probable cause to arrest [] Monson." Because probable cause operates as "an absolute defense to a malicious prosecution claim," Defendants argue that the court improperly denied qualified immunity on Monson's federal malicious prosecution against Officers Crockett, Simon, Ghougoian, and Braxton. Monson responds that this "ruling was an evidentiary ruling, not the denial of a qualified immunity motion for summary judgment."

As a threshold matter, Monson moved for judgment as a matter of law on his claims that Crockett seized Monson at the murder scene and transported him to police headquarters without Monson's consent or probable cause, where he was detained without probable cause at police headquarters. Defendants asserted a qualified immunity defense, submitting that Monson failed to demonstrate a lack of probable cause to arrest or continue to detain him. The district court found that Monson was "detained at the scene" because he "was not free to leave," and held that Defendants arrested Monson without probable cause because "[t]hough [D]efendants continue to argue in the briefing that Monson's mere presence at the scene [provided] probable cause to arrest him, [t]he Court has already ruled that it [did] not." *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (holding that an individual's mere presence at a site where law enforcement possess probable cause that a crime has occurred does not, on its own, supply probable cause to search or seize that person, because "a search or seizure of a person must be supported by probable cause particularized with respect to that person"). The district court decided that "the jury will be advised that Monson was

arrested without probable cause." This holding was not a direct ruling on Defendants' motion for qualified immunity—it established a certain fact as supported by the evidence, rather than adjudicating whether Defendants violated clearly established law. The district court clarified that "a limiting instruction will also be given that this finding is not relevant to any of the remaining claims and is being shared merely to give the jury the full factual background of Monson's prosecution."

If simply a challenge to the district court's evidentiary ruling, we would lack jurisdiction to consider the Defendants' argument that Monson voluntarily went to the police station. *See* 28 U.S.C. § 1291. But they argue that this issue bears on the malicious prosecution claim. Analogizing to false arrest cases, Defendants argue that if Monson voluntarily went to the station and officers had probable cause to arrest him there for a different crime, then Monson's malicious prosecution claim becomes significantly weaker. While the Supreme Court has said that malicious prosecution is a kind of Fourth Amendment claim, *Thompson v. Clark*, 596 U.S. 36, 42 (2022), the question here is whether officers had probable cause to charge Monson, not to arrest him, *see id.* at 43 (malicious prosecution claim requires showing "the wrongful initiation of charges without probable cause"); *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (malicious prosecution concerns probable cause for "the crime charged") (quoting *MacDermid v. Discover Fin. Servs.*, 342 F. App'x 138, 146 (6th Cir. 2009)). Neither Monson's transport to the station nor his detainment for unrelated crimes bears on that question.

We turn next to the malicious prosecution claims on which Defendants moved for summary judgment. A malicious prosecution claim requires a plaintiff to demonstrate:

> (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from

the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016) (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)). "To demonstrate a favorable termination of a criminal prosecution" in satisfaction of the claim's final element, "a plaintiff need only show that his prosecution ended without a conviction." *Thompson*, 596 U.S. at 39. Plaintiffs must also "provide evidence that each defendant personally violated their rights." *France*, 836 F.3d at 625.

At the summary judgment hearing, the parties agreed that "the only elements at issue are the probable cause to prosecute Monson and the individual officers' participation in the decision to prosecute." The court determined that "a reasonable jury could conclude that there was no probable cause to believe that Monson had committed Brown's murder." The court then found that genuine issues of material fact remain regarding Officers Crockett, Simon, Ghougoian, and Braxton's influence on the decision to prosecute, foreclosing a grant of qualified immunity.

Defendants argue that even accepting the facts as Monson alleges, they still had probable cause to charge him with murder. They point to medical evidence that Brown's head trauma occurred shortly before her death, and to evidence that Monson was in the apartment with her shortly before her death. Yet none of the evidence as to the true cause or timing of Brown's death was known when the officers charged Monson. *Sykes*, 625 F.3d at 311 (explaining that a malicious prosecution claim looks at "whether probable cause existed to *initiate* the criminal proceeding") (emphasis added). The officers' medical evidence that Brown died from trauma to her head inflicted shortly before death came to light at Monson's preliminary examination, well after Monson was charged. In fact, when police sent the prosecutor their investigation report, they still identified the cause of death as "multiple stab wounds." What remains for probable cause are Monson's own statements and the statement of Linda Woods. But Monson provided evidence that

none of these statements presented a reliable picture. Crediting that evidence, the district court correctly concluded that a reasonable jury could find the officers lacked probable cause to charge him with murder.

### 2. *Fabrication of evidence*

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)). "An officer violates a person's constitutional rights when he knowingly fabricates evidence against them and a reasonable likelihood exists that the false evidence would have affected the jury's decision." *France*, 836 F.3d at 629. "A plaintiff does not need to show that the government lacked probable cause to prevail on a fabrication of evidence claim." *Id.* (citing *Stemler*, 126 F.3d at 872).

This standard is not new. Rather, as *Stemler* recognized, "[u]nder law that was clearly established in 1994, [an officer] would have violated [a defendant's] right to due process if he knowingly fabricated evidence against [the defendant] and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury." 126 F.3d at 872; *see id.* (collecting authorities); *see also Jackson v. City of Cleveland*, 925 F.3d 793, 826 (6th Cir. 2019) (amended opinion) (same). We have also recognized that a law enforcement official was "on notice in 1975 that it was unlawful for him to fabricate evidence" where such false evidence served "to procure testimony in conformance with it" at trial. *Jackson*, 925 F.3d at 826.

Defendants appeal the district court's denial of qualified immunity on Monson's fabrication of evidence claims against Officers Simon, Ghougoian, and Braxton, based on the statements they allegedly drafted and had Monson sign. They also challenge the denial of qualified

immunity on Monson's claim that Officers Simon and Crockett knowingly fabricated Stewart's statement. We address each set of claims.

The Defendants contend that the court erred when it allowed Monson to claim Simon fabricated portions of his first statement. Invoking judicial estoppel and the sham affidavit doctrine, they point to an earlier hearing where Monson said his first statement was true and voluntarily given. The officers failed to raise this point below, forfeiting the argument. In any event, the sham affidavit doctrine applies when a party files an affidavit after a motion for summary judgment, which does not apply here. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). As for estoppel, no prior court ever "accepted or relied upon" Monson's claim that his first statement was voluntary. *Pennycuff v. Fentress Cnty. Bd. of Educ.*, 404 F.3d 447, 453 (6th Cir. 2005).

Next, Defendants claim that Monson failed to present specific facts that Braxton knowingly fabricated the second statement. The district court did not err in concluding the opposite. Monson alleged that Braxton typed up a statement by reading off another piece of paper and speaking with Ghougoian—not simply by interrogating Monson. And the statement Braxton produced matched the self-defense scenario allegedly offered by Ghougoian. From this, a jury could reasonably conclude that Braxton knowingly fabricated Monson's second claim.

Defendants also challenge the denial of qualified immunity on Monson's claims that Simon and Crockett fabricated Stewart's statement. In addition to disputing the facts, Defendants urge that the district court improperly denied qualified immunity on Monson's claim of fabrication of evidence claims regarding Stewart's statement on the basis that Monson failed to demonstrate that Simon or Crockett violated his rights. And they argue that Stewart's inability to identify Simon or Crockett by name or discrete physical features renders Monson unable to prove that either

officer violated his rights. They also contend that the prosecutor's "[i]ndependent decisions," including speaking with Stewart "about her statement and testimony on the morning of trial" constituted "break[s]" in "the chain of causation," which doom Monson's fabrication of evidence claims.

First, Defendants are incorrect that the record fails to provide specific evidence of Crockett and Simon's involvement. Crockett admitted he took information from Stewart. And Simon signed Stewart's statement. That provides a sufficient evidentiary foundation for a reasonable jury to infer their involvement with any alleged fabrication.

A plaintiff may raise a fabrication of evidence claim where "the statement coerced [a witness] to testify in conformance with it." *Jackson*, 925 F.3d at 817. When initially recalled to the stand during the state court trial, Stewart denied knowing that Monson threatened Brown due to a robbery. The prosecutor then refreshed Stewart's recollection with the fabricated statement. After reading the statement, Stewart testified that Brown "did tell [her] that [Monson] had threatened [Brown] after the robbery," and that Monson told Brown he would "kill her if she didn't get out of his face." This scenario parallels *Jackson*. *See* 925 F.3d at 804–05. As explained by the district court, here "a reasonable jury could conclude that the fabricated statement—which recounted Monson explicitly threatening Brown's life a few weeks before her murder—affected the decision of the [murder trial] jury." Accordingly, the court correctly denied qualified immunity on the fabrication of evidence claim related to Stewart. *See id.* at 825–26.

Defendants also urge that the prosecutor's charging decision broke the chain of causation between the alleged fabrication and Monson's conviction. But this argument ignores *Jackson*. The district court ruled that Defendants' argument regarding the prosecutor's role was "not relevant here" because Monson's fabrication of evidence claims against Simon and Crockett stem

from the false statement's coercion of Stewart's testimony at trial, not the prosecutor's charging decision. This determination coheres with *Jackson*. *See* 925 F.3d at 817. Defendants fail to identify a legal infirmity with this conclusion, and so we affirm.

### 3. Coerced confession

"In determining whether a confession is compelled, the constitutional inquiry is whether 'a defendant's will was overborne in a particular case,' considering 'the totality of all the surrounding circumstances.'" *Peterson*, 931 F.3d at 555 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The Supreme Court has explained that "the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was 'free and voluntary,'" meaning not "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy v. Hogan*, 378 U.S. 1, 7 (1964) (quoting *Bram v. United States*, 168 U.S. 532, 542–43 (1897)). Coercion, moreover, can include "so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." *Id.*

In response to the district court's ruling, Defendants point out that Monson voluntarily endorsed a notification of his constitutional rights and that he had "not been threatened or promised anything." This, they argue, defeats any coercion claim. A waiver can be voluntary, however, and a subsequent confession can still be coerced. We have held as much in the past. *See Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991) (finding a confession involuntary even after *Miranda* warnings), *rev'd on other grounds*, 507 U.S. 680 (1993). The same is true here. Monson alleged that Ghougoian induced him to sign the statement based on false promises. Even if he chose to endorse this constitutional notification, his resulting statement may still qualify as coerced.

Monson's statements at an earlier hearing do not alter this analysis. Defendants submit that because of minor differences between Monson's earlier and later statements about Ghougoian's conduct, he should be prevented from arguing that Ghougoian promised him anything. But here, too, judicial estoppel does not apply—there is no evidence any court relied on the minor differences between Monson's testimony, and in any event, Monson lost the earlier proceeding. *Pennycuff*, 404 F.3d at 453.

Defendants also argue that Ghougoian's conduct did not violate clearly established law. By 1996, courts, including this one, recognized "that a promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary." *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992). The district court pointed to Monson's contention "that the second statement [he signed] was coerced because Ghougoian, with Braxton's help, made an illusory promise that Monson could go home if he signed the second statement[,] which admitted to stabbing Brown in self-defense." Monson testified that he did not voluntarily give the information in the second statement to Braxton. He signed the statement, rather, because the "only thing [he was] looking for [was] the release" from detention. Taking "the facts that the district court assumed," as we must, *see Johnson*, 515 U.S. at 319, "early [on January 20], Ghougoian interrogated Monson and promised him that he could go home if he signed a Second Statement." "[Monson] agreed to the deal, and Braxton typed up the self-defense story that Ghougoian had contrived." The court held that "the evidence amply supports Monson's allegations that Ghougoian made false promises of leniency to Monson which Ghougoian knew would not be fulfilled." Defendants' arguments do not undermine this legal conclusion, and we therefore affirm.

*4.* Brady *violation*

Under the Fourteenth Amendment's Due Process Clause, a state cannot "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. *Brady v. Maryland*, 373 U.S. 83, 87 (1963), recognized "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady* violations can occur where "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony[,]" "the prosecution knew, or should have known, of the perjury," and the prosecution withheld the material evidence requested by the defense. *United States v. Agurs*, 427 U.S. 97, 103–04 (1976). The Supreme Court has long held that *Brady* obligations extend beyond prosecutors "to preclude other governmental 'authorities' from making a 'calculated effort to circumvent the disclosure requirements established by *Brady* [] and its progeny.'" *Moldowan*, 578 F.3d at 379 (quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984)) (alteration in *Moldowan*). "[E]ven though the state's obligation under *Brady* is managed by the prosecutor's office, that obligation 'applies to relevant evidence in the hands of the police, whether the prosecutors knew about it or not, whether they suppressed it intentionally or not, and whether the accused asked for it or not.'" *Id.* at 378 (quoting *Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009)).

A *Brady* violation consists of "three components": (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Prejudice requires demonstrating "that the allegedly suppressed evidence was 'material.'" *Jackson*, 925 F.3d at 815 (quoting *Strickler*, 527 U.S. at 280). "Evidence is material when 'there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *France*, 836 F.3d at 630 (quoting *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995)). "A 'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Defendants contend that the district court erred in denying Simon qualified immunity on Monson's *Brady* claims. The only material relevant for qualified immunity purposes is the fingerprints on the toilet tank. Monson has consistently identified Simon's failure to turn over the usable, unidentified latent prints on the toilet tank's top as the source of his *Brady* violation. And the district court expressly confined its analysis of the *Brady* claim to that issue at both the motion to dismiss, and summary judgment stages. This issue, then, bears on the legal qualified immunity analysis—and we can exercise jurisdiction over it on interlocutory review. *See Bey v. Falk*, 946 F.3d 304, 316 (6th Cir. 2019).

"[T]he loss"—which can include both "destruction or concealment"—of "'materially exculpatory' evidence directly threatens the fundamental fairness of a criminal trial, and thus undoubtedly implicates the Due Process Clause." *Moldowan*, 578 F.3d at 385. Under such circumstances, "[*Arizona v.*] *Youngblood* [488 U.S. 51 (1988)] says, 'the interests of justice' simply impose a higher burden on state actors, including the police." *Id.* (quoting *Youngblood*, 488 U.S. at 58). What matters here is Simon's alleged failure to disclose the unidentified print on the toilet tank top to the prosecution. As stressed by the district court, the key is that "once Simon learned Brown died as a result of a blunt force trauma to the head, sitting on the unidentified fingerprints meant she was hiding evidence that, at the very least, contradicted the state's" theory of the case. The fingerprint evidence on the toilet tank "undercut the state's theory of a stabbing precipitated by a lover's quarrel" and therefore, a jury could find that "Simon violated *Brady*

because she sat on evidence that could have exculpated Monson." Simon's inability to "recall" whether she informed the prosecutor about the unidentified fingerprints "on the probable murder weapon" provides grounds for a reasonable jury to conclude that she failed to disclose this fact to the prosecution, because the potential "'exculpatory value' of the evidence" was "apparent." *Moldowan*, 578 F.3d at 388. These prints could—and, in fact, did—belong to another suspect: Robert Lewis. Moreover, the report indicated that none of the prints matched Monson's. "[E]vidence that someone else was in the room was more than neutral," the district court aptly observed, "when coupled with phone calls from a tipster"—Bentley—"that another resident committed the murder."

The murder trial record complicates matters, however. On the one hand, the prosecutor's statement that she "had asked Barbara Simon if there had been any prints because I knew prints had been taken, and her representation was that *there were no usable prints*" could support a reasonable trier-of-fact's finding that Simon failed to disclose the latent print report to the prosecution. "*Brady* obliges a police officer to disclose material exculpatory evidence only to the prosecutor"; therefore, if Simon never informed the prosecutor of the existence of a usable, unidentified print on the probable murder weapon, then she violated her duties under *Brady*. *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014). Such a failure to inform prosecutors of potentially exculpatory evidence frustrates criminal courts' central purpose to effectuate "the truth-seeking function of trial." *Portuondo v. Agard*, 529 U.S. 61, 69 (2000) (quoting *Perry v. Leeke*, 488 U.S. 272, 282 (1989)). It was only through the work of the Michigan Innocence Clinic, after Monson had spent more than a decade incarcerated for Brown's murder, that investigators conducted tests matching the print on the toilet tank top to another suspect, Lewis.

Absent a showing of prejudice so great that it "prevented [the defendant] from receiving his constitutionally guaranteed fair trial," however, "[t]he government will fulfill its constitutional obligation by disclosure at trial." *United States v. Farley*, 2 F.3d 645, 654 (6th Cir. 1993). Although Monson's defense counsel at the murder trial objected to the introduction of Monson's fingerprint on the mirror, he later stipulated to the introduction of the latent print report into evidence. Defense counsel's acquiescence to introduction of the prints recovered at the scene, including the unidentified, usable print on the toilet tank lid, precludes a finding of prejudice. Due to the parties' stipulation at trial, this set of facts does not satisfy the third requirement of *Brady*. We therefore reverse the denial of qualified immunity to Simon on Monson's *Brady* claim.

### C.     Motion for Sanctions

Monson also moves for sanctions under Rule 38 of the Federal Rules of Appellate Procedure. That rule authorizes this court to "award just damages and single or double costs to the appellee" if we "determine[] that an appeal is frivolous." Fed. R. App. P. 38. "An appeal is frivolous if it is obviously without merit and is prosecuted for delay, harassment, or other improper purposes." *Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 944 (quoting *Vic Wertz Distrib. Co. v. Teamsters Loc. 1038*, 898 F.2d 1136, 1143 (6th Cir. 1990)). Features that may indicate a frivolous appeal include untimeliness, *see id.*; "when the result is obvious or when the appellant's argument is wholly without merit," *Dubay v. Wells*, 506 F.3d 422, 433 (6th Cir. 2007) (quoting *Pieper v. Am. Arb. Ass'n*, 336 F.3d 458, 465 (6th Cir. 2003)); or where an appeal is "clearly futile and apparently prosecuted for improper purposes," *McDonald v. Flake*, 814 F.3d 804, 817 (6th Cir. 2016). A case that "may indeed be quite weak" does not, absent some indicators of impropriety, merit sanctions. *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 308 (6th Cir. 2008).

The parties essentially restate their merits arguments in their briefing on sanctions. Monson also references *Sanford v. City of Detroit*, 815 F. App'x 856 (6th Cir. 2020), for the proposition that Defendants' counsel here (who represented the defendants in *Sanford*, as well as "the City of Detroit, [] and other municipalities in" § 1983 cases) filed this appeal for improper purposes. Monson points to our affirmance of the denial of qualified immunity on the fabrication of evidence, coerced confession, and malicious prosecution claims in *Sanford*, 815 F. App'x at 859, for the proposition that counsel "filed the present appeal knowing it was without merit and with no reasonable expectation of prevailing." Referencing the other side's "experienced . . . counsel," Monson argues that Defendants filed this appeal to "delay and to increase the cost of this litigation." The filing of an appeal necessarily increases costs and delays resolution of litigation. *See Yates v. City of Cleveland*, 941 F.2d 444, 448 (6th Cir. 1991) (discussing the reality that "*Forsyth* appeals [of denial of qualified immunity] can be employed for the sole purpose of delaying trial"). This record is insufficient, however, to establish an improper motive for Defendants' appeal. Absent such facts, we decline to award sanctions, and DENY the motion.

### III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court denying qualified immunity as to the federal malicious prosecution claims against Crockett, Simon, Ghougoian, and Braxton, the fabrication of evidence claims against Crockett, Simon, Ghougoian, and Braxton, and the coerced confession claim against Ghougoian. We **REVERSE** as to the *Brady* claim against Simon; **DENY** the motion for sanctions; and **REMAND** the case to the district court for trial.